# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

IN RE:

**GREEN RIVER BIODIESEL, INC.**            BK 08-72626-CMS-11

         **DEBTOR.**

## MEMORANDUM OPINION

This case came before the court on April 26, 2010 for a hearing on Quality Carriers, Inc.'s ("QCI") Motion for Leave to File Late-Filed Claims ("Motion") and for hearing on Debtor's Objection to Quality Carrier, Inc.'s Motion for Leave to File Late Filed Claims ("Objection"). Steve Berman appeared on behalf of QCI; Charles L. Denaburg and Rita H. Dixon appeared on behalf of Green River Biodiesel, Inc. ("Debtor"). After consideration of the evidence submitted at the hearing and the arguments of the parties the court **GRANTS** QCI's Motion for Leave to File Late-Filed Claims and **OVERRULES** Debtor's Objection.

## JURISDICTION

The Bankruptcy Court has jurisdiction of this case pursuant to 28 U.S.C. § 1334(a). This court has jurisdiction of this issue, a core bankruptcy proceeding, pursuant to 28 U.S.C. § 157(b). Jurisdiction is referred to the bankruptcy courts by the General Order of Reference of the United States District Courts for the Northern District of Alabama, Signed July 16, 1984, As Amended July 17, 1984.

## FINDING OF FACTS

QCI is an Illinois corporation and the largest bulk transportation company in North America.

(Bk. Doc. 395). Debtor is a Delaware corporation that was engaged in the business of manufacturing biodiesel fuel at its plant located in Moundville, Alabama prior to the filing of this bankruptcy petition. On July 10, 2008, Debtor and QCI entered into a contract pursuant to which QCI agreed to transport goods for Debtor, and Debtor agreed to pay QCI for its transportation services ("Agreement"). (QCI Exhibit 1). Specifically, the Agreement required QCI to transport and deliver on behalf of Debtor "such quantities of goods described in Appendix A." In order to fulfill its terms under the contract with Debtor, QCI purchased tractors and trailers to be dedicated to service the Debtor and provided on site drivers at Debtor's Moundville location.

The Agreement provided that QCI is located at 4041 Park Oaks Boulevard, Tampa, Florida, 33610, and that Debtor is located at 12982 Cracker Road, Moundville, Alabama, 35474. The Agreement further provided that: "All notices required to be given pursuant to this Agreement shall be in writing and addressed to the respective parties at the address indicated above." The address listed for QCI is the location of QCI's headquarters; it is also the address from which Debtor was billed by QCI. The testimony indicates that a copy of the Agreement was kept by Debtor as part of its business records. In addition to the Agreement, QCI also produced multiple invoices that were prepared between September 4, 2008 through May 19, 2009. (QCI Exhibit 2). At the top of all of the invoices, there are two addresses given for QCI. In the upper left-hand corner is a "remit to" address, located at 4910 Paysphere Circle, Chicago, IL 60674-4910.[1] In the upper right-hand corner is a "correspondence to" address, located at 4041 Park Oaks Blvd Ste 200, Tampa, FL 33610. Both

---

[1] Although QCI is an Illinois corporation, QCI does not maintain an office there. QCI does have a place of business designated with the Secretary of State for the State of Illinois and a designated agent for receipt of service process. Neither of those addresses are located at 4910 Paysphere Circle, Chicago, IL 60674-4910.

2

addresses are typed in the same font and are of the same size and prominence. The testimony indicates that copies of the invoices were kept by Debtor as part of its business records.

In late 2008, Debtor failed to ship the expected quantities of biodiesel, i.e., the quantities set forth on Appendix A to the Agreement.[2] As a result, QCI presented Debtor with invoices for fixed charges allegedly due under the Agreement. A dispute arose between the parties as to the amount Debtor owed QCI. Debtor asserted that the fixed-cost charges invoiced by QCI were due to be offset because Debtor shipped larger-than-expected quantities of other products, primarily soybean oil, using the services of QCI.[3] QCI agreed that some charges could be offset; however, QCI did not believe that any offset would be large enough to wipe out the fixed-cost charges, as evidenced by an email sent by QCI on January 28, 2009. (QCI Exhibit 5). The email asserts a claim of $442,673.00 in fixed costs, which includes $345,320.00 in QCI's driver pay and start up costs. Itemized expenses are attached to the email to provide support. This email was sent to Arthur G. Huggard, an employee of Debtor. When he received the email, Mr. Huggard forwarded the email to Basil Karampelas, the Chief Financial Officer (CFO) of the Debtor, and Chris Tewell, the Chief Executive Officer (CEO) of Debtor. In the forwarded email, Mr. Huggard suggested that a counter-proposal of "[p]erhaps

---

[2]Between September 19, 2008 and November 20, 2008, the date on which four of the Debtor's creditors filed an involuntary Chapter 7 bankruptcy case against the Debtor, QCI asserts that it rendered transportation services and invoiced the Debtor for the transportation services. QCI further asserts that it has not been paid for these transportation services. In addition, QCI asserts that it rendered transportation services to the Debtor subsequent to the filing of the Chapter 7 bankruptcy case. QCI further asserts that it has not been paid for these transportation services. QCI further alleges that Debtor owes QCI a total of $445,021.59 for unpaid transportation services.

[3]Debtor now asserts that it does not owe QCI any money. While the emails between the employees of QCI and Debtor do indicate a dispute as to the amount that should be offset against the fixed costs charged by QCI pursuant to the Agreement, there is no correspondence where QCI is told by Debtor that Debtor does not owe it any money.

$100K" should be made to QCI. On February 18, 2009, another email was sent from QCI to Jewell Russell, an employee of Debtor, asserting an overdue balance of $443,083.34. (QCI Exhibit 6). The email indicates that QCI is located at 4041 Park Oaks Blvd., Tampa, FL 33610, and further indicates that any payment should be remitted to 4910 Paysphere Circle, Chicago, IL 60674. This email was forwarded by Jewell Russell to Sylvia Smith, another employee of Debtor.

On November 21, 2008, around the same time that Debtor began having problems with QCI, an involuntary Chapter 7 bankruptcy case was filed by four of the Debtor's creditors. QCI was not one of the creditors who filed the involuntary petition. On March 3, 2009, Debtor consented to the conversion of the involuntary Chapter 7 case to a case under Chapter 11 of the Bankruptcy Code, and an order for relief was entered March 5, 2009. An internal email shows that QCI was aware that Debtor was in bankruptcy on March 6, 2009, one day after the order for relief was entered. (QCI Document 00723).[4]

On March 25, 2009 the Debtor filed its schedules. (Bk. Doc. 105). Despite the fact that Debtor and QCI had been communicating in January and February of 2009 through emails about the roughly $440,000.00 that QCI was asserting Debtor owed it, QCI was not listed as an unsecured creditor on Schedule F. Instead, Debtor listed QCI as the holder of an executory contract on

---

[4]There was much testimony concerning whether QCI was told that Debtor was planning to treat it as a critical vendor in this bankruptcy proceeding. Linda Garner, the Accounts Receivable Manager at QCI, testified that she had been told by one of Debtor's attorneys in late March of 2009 that QCI would be treated as a critical vendor; that QCI would be paid in full by Debtor; and that QCI did not have to file a proof of claim. QCI's in-house counsel testified that the conversation was relayed to him in late March of 2009. Debtor's attorney, while admitting that she spoke to the employee of QCI, vehemently denies that there was any discussion of QCI being treated as a critical vendor. It is not necessary for this court to determine whether QCI was told it would be a critical vendor for this court to determine whether QCI should be granted leave to file a late claim. Therefore, this court declines to make any findings regarding this issue and also declines to give a detailed analysis of the relevant evidence.

4

Schedule G.[5] On Schedule G, Debtor listed QCI's address as 4910 Pace Sphere Cir., Chicago, Illinois, 60674-4910 ("Chicago lock-box address"). It is clear from the testimony that the Chicago lock-box address was extracted from Debtor's Quickbooks, a program used for the payment of invoices. As laid out in great detail above, this address was listed on the invoices as the "remit to" address, not the "correspondence to" address. Furthermore, the address listed on Schedule G is not the address to which Debtor agreed to send all notices pursuant to the Agreement. One of Debtor's attorneys testified that if she was filling out the schedules today, she would have listed both of the QCI addresses for notice purposes.

Because Debtor listed QCI's address as the Chicago lock-box address, that address was also used in forming the Creditor Matrix, which lists all creditors entitled to notice and the addresses to which those notices are sent. Therefore, all notices sent to QCI were mailed to the Chicago lock-box

---

[5]The court questions Debtor's choice to list QCI as a creditor on Schedule G instead of on Schedule F. All the evidence supports the fact that Debtor was aware that QCI was asserting an unsecured claim of roughly $440,000.00 for unpaid services. There were discussions between Debtor and QCI for months prior to the filing of the schedules. In addition, the document titled S3(b), which is attached to the Statement of Financial Affairs filed with the Debtor's schedules on March 25, 2009, shows that QCI was paid $347,947.49 prepetition and was owed $334,897.03. (Bk. Doc. 105). On April 16, 2009, the Debtor filed an Amended SOFA 3(b), an amended version of S3(b). The Amended SOFA 3(b) indicates that QCI was paid $347,947.49 prepetition and was owed $841,139.45. If the Debtor recognized in its Statement of Financial Affairs and Amended Statement of Financial Affairs that QCI was owed a substantial amount of money, why did the Debtor not list QCI on Schedule F? The following explanation was offered: The CFO of the Debtor did some calculations and came to the conclusion that the Debtor did not owe QCI any money. First, this explanation is contradicted by the documentary evidence. Second, even if the CFO was correct in his conclusions, it disturbs the court that Debtor thinks it can unilaterally decide to whom it owes money. At all times QCI asserted that it was owed a substantial amount of money. Accordingly, the asserted debt should have been listed on Schedule F. If Debtor disagreed with the amount of money being claimed by QCI, it should have marked the debt as disputed. When parties to an agreement disagree over the terms of the agreement, it is for the court to decide the outcome, not one of the parties.

address.[6] This means that Debtor's Motion to Set General Bar Date and Approve Form of Notice was sent to the Chicago lock-box address and the Order Setting General Bar Date and Approving Form of Notice[7] was sent to the Chicago lock-box address. (Bk. Docs. 118 & 135). In fact, all of the documents that would have given QCI notice of the bar date were sent to the Chicago lock-box address.

The Chicago lock-box was managed by Bank of America. There is no evidence of an agreement between QCI and Bank of America that Bank of America would be responsible for forwarding any mail that was sent to the Chicago lock-box address. However, employees of QCI testified that QCI received mail forwarded by Bank of America, but that QCI did not receive mail from Bank of America on a consistent basis. The evidence supports this testimony. QCI produced approximately twenty-two envelopes, only a small fraction of the envelopes that would have been sent to QCI throughout the life of this case. Twenty of these envelopes were sent from the United States Bankruptcy Court; one of the envelopes was sent from Najjar Denaburg, P.C., the law firm employed by the Debtor; and one of the envelopes was sent from the Office of the Bankruptcy Administrator. All of the envelopes were addressed to QCI at its Chicago lock-box address. None of the envelopes have discernable dates or postmarks on them.

There is no evidence to indicate that any of the envelopes sent by the United States Bankruptcy Court to the Chicago lock-box address, which was forwarded to QCI at its Tampa headquarters address by Bank of America, contained any documents that would have given QCI

---

[6] There is no evidence that any notice sent to the Chicago lock-box address was returned to the Bankruptcy Clerk's Office or to Debtor's counsel.

[7] The court entered the Order Setting the Bar Date on April 8, 2009. The order set out a general bar date of May 11, 2009.

6

notice of the May 11, 2009 bar date prior to its expiration. Numerous courts documents, including motions, orders, and notices, were produced by QCI in the course of this proceeding. Some of these court documents have headers reflecting the case number, document number, and the date filed; this information is not found on documents mailed by the court through its mailing contractor, but rather are headers printed on documents when obtained by parties through the courts' Pacer network, thereby evidencing that these were documents obtained by a party's request and not in the normal course of noticing by the court. These documents can be eliminated as documents that might have been forwarded by Bank of America to QCI.[8] In addition, there were some documents that were dated after the May 11, 2009 bar date. These documents can be eliminated as documents that might have been forwarded by Bank of America to QCI prior to the bar date. Therefore, the court concentrated on the court documents that were dated prior to May 11, 2009 and also did not contain any header information. None of these court documents would have given QCI notice that a bar date had been set or that the bar date was set as May 11, 2009. Even if one of these court documents did contain a provision referencing the bar date, there is no way for this court to determine which court

---

[8] QCI Documents 00004 through 00052 are copies of Debtor's First Amended Disclosure Statement dated April 16, 2009. (BK Doc. 148). Within this Disclosure Statement, at II (C)(6), is a recitation of the bar date in this case. The Debtor pointed to this document as proof that QCI received notice of the May 11, 2009 bar date prior to its expiration. Jonathon C. Gold, in-house counsel for QCI, testified that QCI received this document from outside counsel that was hired in January 2010. The documents support Mr. Gold's memory. QCI Documents 00004 through 00052 have headers reflecting the case number, document number, and the date filed; this information is not found on documents mailed by the court through its mailing contractor, but rather are headers printed on documents when obtained by parties through the courts' Pacer network, thereby evidencing that these were documents obtained by a party's request and not in the normal course of noticing by the court. Therefore, QCI Documents 00004 though 00052 are not evidence that QCI had notice of the May 11, 2009 bar date prior to its expiration.

document went with which envelope. Even if the court could determine which court document went with which envelope, there are no dates or postmarks on any of the envelopes. This means there is no way to determine, when the envelope and its contents were sent by the United States Bankruptcy Court to the Chicago lock-box address. This also means that there is no way to determine when the envelope and its contents were forwarded by Bank of America to QCI at its Tampa headquarters. In summation, there is no evidence that any of the documents that could have been sent by the United States Bankruptcy Court reached QCI at its Tampa headquarters prior to the expiration of the May 11, 2009 bar date and there is no evidence that any of the documents that could have been sent by the United States Bankruptcy Court contained any notice of the May 11, 2009 bar date.

There is no evidence to indicate that the envelope sent by the Najjar Denaburg law firm to the Chicago lock-box address, which was forwarded to QCI at its Tampa headquarters address by Bank of America, contained any documents that would have given notice to QCI of the May 11, 2009 bar date prior to its expiration.[9] In particular, there is no evidence that this envelope contained either the Motion to Set General Bar Date and Approve Form of Notice or the Order Establishing a General Bar Date and Approving Form of Notice.[10] First, these documents were not present in the numerous documents produced by QCI. Second, the postmark on the envelope is discernable enough for this court to conclude that the envelope was not mailed on the same day that the Motion to Set

---

[9] The court would again point out that none of the original court documents, i.e., court documents that did not have a header, contained any reference to a bar date. Because the documents produced by QCI do not contain any correspondence from the Najjar Denaburg law firm, this court infers that one of the original court documents was sent in the envelope. Therefore, this court believes the discussion relating to the original court documents also applies in this section.

[10] These were not the only documents mailed by the Najjar Denaburg law firm that referenced the May 11, 2009 bar date, but they are the most important.

General Bar Date and the Order Establishing a General Bar Date were mailed. On April 1, 2009, the Motion to Set General Bar Date and Approve Form of Notice was mailed by the Debtor's attorney. (Bk. Doc. 119). The date of the postmark on the envelope is not clear, but it is clear enough for the court to make out that it was not sent on April 1, 2009. On April 10, 2009, the Order Establishing a General Bar Date and Approving Form of Notice was mailed by the Debtor's attorney. (Bk. Doc. 137). The date of the postmark on the envelope is not clear, but it is clear enough for the court to make out that it was not sent on April 10, 2009. Even if there was evidence that the envelope contained the Motion to Set General Motion to Set General Bar Date and Approve Form of Notice, or the Order Establishing a General Bar Date and Approving Form of Notice, there is no evidence concerning the date that Bank of America forwarded the envelope and its contents to QCI, nor is there any evidence as to the date the envelope and its contents reached QCI at its Tampa headquarters. In summation, there is no evidence that any of the documents sent by the Najjar Denaburg law firm reached QCI at its Tampa headquarters prior to the expiration of the May 11, 2009 bar date.

There is no evidence to indicate that the envelope sent by the Office of the Bankruptcy Administrator to the Chicago lock-box address, which was forwarded to QCI at its Tampa headquarters address by Bank of America, contained any documents that would have given notice to QCI of the May 11, 2009 bar date prior to its expiration. The only correspondence from the Office of the Bankruptcy Administrator contained in the documents produced by QCI is a letter from Joseph E. Bulgarella, Assistant U.S. Bankruptcy Administrator, dated March 4, 2009. The letter informs QCI that an unsecured creditors' committee would be formed in the Debtor's bankruptcy case and asked QCI to fill out a form detailing whether QCI would be willing to serve on the unsecured

9

creditors' committee.[11] The letter also informs QCI of the date of the 341 meeting of creditors. Nowhere in this letter is the bar date mentioned. Even if the letter had mentioned the May 11, 2009 bar date, there is no evidence that indicates when the envelope and its contents were forwarded by Bank of America to QCI at its Tampa headquarters, nor is there any evidence that indicates when the letter reached QCI at its Tampa headquarters.[12]

In short, there was no evidence indicating that QCI received any document that would have given it notice of the May 11, 2009 bar date prior to the expiration of such bar date. Instead, the evidence indicates that it was only upon receiving a copy of the ballot package around January of 2010 that QCI learned that a bar date had been established approximately ten months earlier.[13]

---

[11] The letter also states that QCI was listed "as a creditor on its Chapter 11 List of Creditors Holding 20 Largest Unsecured Claims." This raises questions in the court's mind about why the List of Creditors Holding 20 Largest Unsecured Claims filed with this court on March 25, 2009 did not list QCI as one of the 20 largest unsecured creditors. (Bk. Doc. 105). The court is again left to wonder why the Debtor did not list QCI as an unsecured creditor on Schedule F.

[12] The court notes that on March 4, 2009, the Debtor had not yet even requested that the bar date be set. The court would also note that there is no direct evidence that the envelope mailed by the Office of the Bankruptcy Administrator contained the March 4, 2009 letter. However, the court is comfortable making the inference that the envelope contained the letter.

[13] Jonathan C. Gold, in-house counsel for QCI, testified that there was not a lot of activity in the case from March 2009 through January 2010. He testified that some documents that were mailed to the Chicago lock-box address were forwarded by Bank of America to QCI, but that he was not aware of the dates that those documents were received by QCI. He further testified that none of the documents received by QCI were substantive and that none of the documents led QCI to believe that its rights were being foreclosed. Mr. Gold also testified that he first became aware of the Motion to Set Bar Date and the Order Establishing Bar Date in January of 2010, after QCI decided to engage outside counsel to deal with the matter. Mr. Gold made the decision to engage outside counsel after receiving a copy of the ballot package. Apparently, this ballot packet was sent to Kevin Gautreau's home address. Kevin Gautreau is the Regional Sales Director of QCI. It is not clear why this ballot packet was sent to his home address. Mr. Gold further testified that he was confident that if anyone else at QCI had received either the Motion or the Order, he would have been notified.

## CONCLUSIONS OF LAW

QCI is requesting leave to file a late claim. QCI asserts two main arguments in support of this request. First, QCI argues that it was entitled to receive notice of the bar date separate and apart from notice of the bankruptcy case. QCI asserts that it did not receive such notice of the bar date, that it should not be bound by the bar date, and that it should be allowed to file a late claim. Second, QCI argues that it should be allowed to file a late claim because the doctrine of excusable neglect applies in this case. Debtor opposes QCI's motion and asserts that QCI received notice of the bankruptcy case, that QCI received notice of the bar date prior to its expiration on May 11, 2009, and that the doctrine of excusable neglect does not apply in this case. The court will first address whether QCI received adequate notice of the bar date.

There is no doubt that QCI had actual knowledge of the filing of the Debtor's bankruptcy petition as early as March 6, 2009, one day after the Debtor consented to the conversion of the case from Chapter 7 to Chapter 11. Therefore, the main issue in this case is whether QCI was entitled to receive notice of the bar date and whether it did receive notice of the bar date.[14] This court determines that QCI was entitled to receive notice of the bar date, separate and apart from the notice of the Debtor's bankruptcy filing. The Supreme Court of the United States has held the following:

> Nor can the bar order against New York be sustained because of the city's knowledge that reorganization of the railroad was taking place in the court. The argument is that such knowledge puts a duty on creditors to inquire for themselves about possible court orders limiting the time for filing claims. *But even creditors who have knowledge of a reorganization have a right to assume that the statutory 'reasonable notice' will be given them before their claims are forever barred.* . . . The statutory command for notice embodies a basic principle of justice-that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights.

---

[14]The discussion that follows is predicated on the fact that QCI was a known creditor.

11

City of New York v. New York, N.H. & H.R. Co., 344 U.S. 293, 297, 73 S. Ct. 299, 301 (1953) (emphasis added). Similarly, the Eleventh Circuit Court of Appeals has held the following:

> [W]e hold that 11 U.S.C.A. § 1141 does not discharge the debt of a creditor who was known to an individual corporate debtor and *failed to receive notice under Bankruptcy Rule 2002(a)(8), even if the creditor had actual knowledge of the general existence of the bankruptcy proceedings.*

Spring Valley Farms, Inc. v. Crow (In re Spring Valley Farms), 863 F. 2d 832, 835 (11th Cir. 1989) (emphasis added). This court must follow the cases decided by both the Supreme Court of the United States and the Eleventh Circuit Court of Appeals. As such, this court determines, based upon the language set forth by the above binding authority, that due process requires that creditors in a Chapter 11 case receive notice of the *bar date* before they can be forever barred from asserting a claim against the Debtor. It is not enough that a creditor have knowledge or notice of a pending bankruptcy case. In re Arch Wireless Inc., 534 F. 3d 76, 85 (1st Cir. 2008) (quoting Fogel v. Zell, 221 F. 3d 955, 964 (7th Cir. 2000)) ( "As the Seventh Circuit describes it, the general rule 'is that the only knowledge required is knowledge of a critical stage of the proceeding from which the bar date can be computed, not of the bar date itself.' . . . Unlike in Chapter 7 and 13 proceedings where the bar date may be roughly computed based on one's knowledge of the creditors meeting, there is simply no way to 'compute' a bar date in a Chapter 11 proceeding because the date is set at the discretion of the court."). This leaves the question of whether QCI did in fact receive notice of the May 11, 2009 bar date prior to its expiration.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."

12

Case 08-72626-CMS11    Doc 474    Filed 09/24/10    Entered 09/24/10 13:27:36    Desc
Main Document    Page 12 of 15

Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S. Ct. 652, 657 (1950). This court finds that the notices sent to QCI at the Chicago lock-box address were not "reasonably calculated, under all the circumstances, to apprise" QCI of the goings-on in the Debtor's bankruptcy case. In both the Agreement and in all the invoices sent to the Debtor by QCI, QCI made it clear that QCI expected all correspondence to be sent to its address at 4041 Park Oaks Boulevard, Tampa, Florida, 33610. In addition, it is clear that Debtor kept the Agreement and the invoices as part of its business records. Given these facts, the Debtor should have listed the Tampa address as the address for QCI on its bankruptcy schedules. Instead, the Debtor listed the Chicago lock-box address.[15] As a result, all notices were sent to the Chicago lock-box address.[16] Under the circumstances discussed above, this was not the appropriate address to send notices to QCI. The invoices were readily available to Debtor, and if Debtor had checked its files it would have known that the Chicago lock-box address was a remittance address, not a correspondence address. The evidence shows that Debtor had two addresses for QCI readily available: one was a remittance address and one was a correspondence address. When a correspondence address is readily available to a debtor, it is not appropriate for such debtor to list the remittance address as the proper address to send notices. That is exactly what happened in this case. Because Debtor could have discovered the correspondence

---

[15] As a reminder, the Chicago lock-box address is the address shown on the invoices as the "remit to" address, i.e. the address to which the Debtor should remit payment. Generally speaking, a lock-box is a service offered by banks to companies in which a company receives payments by mail, the bank picks up the payments and deposits them into the company's account, and notifies the company of the deposit. This has become a fairly common financial arrangement.

[16] This court examined the relevant Certificates of Services filed by the Debtor's attorneys and all such certificates indicated that notice had been sent to QCI at the Chicago lock-box address.

13

address with only a slight effort, this court finds that the notices sent to the Chicago lock-box address were not "reasonably calculated, under all the circumstances, to apprise" QCI of the goings-on in the Debtor's bankruptcy case; therefore, the requirements of due process were not met in this case and QCI did not receive adequate notice of the May 11, 2009 bar date.[17]

This leaves one final issue to be resolved, the issue of whether QCI had knowledge of the May 11, 2009 bar date prior to its expiration. This issue needs to be addressed because QCI would be bound by the May 11, 2009 bar date if it had knowledge of the bar date, even if QCI did not receive adequate notice. There is no evidence that QCI had actual knowledge of the May 11, 2009 bar date prior to such bar date. QCI produced envelopes that were addressed to QCI at the Chicago lock-box address and also produced original court documents that were not obtained from the Pacer network. This is evidence that mail addressed to QCI at the Chicago lock-box address is sometimes forwarded to QCI at its Tampa headquarters by Bank of America, but this is not evidence that QCI received any document that would make QCI aware of the May 11, 2009 bar date prior to its expiration. As detailed above, none of the original court documents mentioned the May 11, 2009 bar date and none of the envelopes contained any information that would allow the court to deduce when the envelopes were mailed to the Chicago lock-box address, when the envelopes were forwarded by Bank of America, or when the envelopes reached QCI. In addition, there is no

---

[17] The Debtor argued that the notices sent to QCI at the Chicago lock-box address were adequate because the notices were mailed properly to that address and that when documents are mailed properly, there is a presumption created that the documents arrived at the address to which they were mailed. It is true that the proper mailing of a document creates the presumption that the document was received by the addressee, but this presumption would only be relevant if the issue in this case was whether the notices mailed to the Chicago lock-box address arrived at the Chicago lock-box address. That is not the issue in this case; the issue in this case is whether the Chicago lock-box address was the correct address to send notices.

evidence that any employee of QCI had knowledge of the May 11, 2009 bar date: None of the internal documents produced by QCI reference the bar date, and two employees of QCI testified that no one at QCI had knowledge of the bar date. Based on the foregoing, this court finds that QCI did not have knowledge of the May 11, 2009 bar date prior to its expiration. As a result, this court holds that QCI should not be bound by the May 11, 2009 bar date and that QCI's Motion for Leave to File Late-Filed Claims should be granted.[18]

## CONCLUSION

The notices sent to QCI at the Chicago lock-box address did not comport with due process; therefore, QCI did not receive adequate notice of the May 11, 2009 bar date. In addition, QCI did not have knowledge of the May 11, 2009 bar date prior to its expiration. Having neither adequate notice nor knowledge of the May 11, 2009 bar date, QCI is not bound by the May 11, 2009 bar date.

Therefore, this court **GRANTS** QCI's Motion for Leave to File Late-Filed Claims and **OVERRULES** Debtor's Objection.

**DONE and ORDERED** this September 24, 2010.

/s/ C. Michael Stilson
C. Michael Stilson
United States Bankruptcy Judge

---

[18] Because the court granted QCI's Motion for Leave to File Late-Filed Claims on notice grounds, the court will not address the issue of excusable neglect.

15